UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ISSAC WILCOX, JR.**,                                      Case No. 1:11 CV 853

            Plaintiff,                            Judge James S. Gwin

    v.                                              REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

           Defendant.                           Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Issac Wilcox, Jr. appeals the administrative denial of Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) under 42 U.S.C. § 1383 and 42 U.S.C. § 405(g), respectively. The district court has jurisdiction over this case under 42 U.S.C. §§ 1383(c)(3), 405(g). This case was referred to the undersigned for the filing of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated May 2, 2011). For the reasons given below, the Court recommends the Commissioner's denial of benefits be affirmed.

### BACKGROUND

Plaintiff filed applications for SSI and DIB on April 20, 2006, alleging a disability onset date of December 29, 2004. (Tr. 111–128). His applications were denied initially (Tr. 86–97) and upon reconsideration (Tr. 75–80). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 66, 71). Born in 1958, Plaintiff was 51 years old at the time of the hearing. (Tr. 111).

Medical History

Plaintiff's main medical impairments stem from his back pain and depression. The medical records in the transcript also reflect Plaintiff's history of crack cocaine and alcohol abuse (Tr. 209, 255, 258, 372, 468, 489, 796) and five or six periods of incarceration totaling thirteen years (Tr. 312,

472, 581, 708).

At one point, the year before the alleged onset date, Plaintiff tested positive on a PTSD screening conducted by the VA. (Tr. 468). He reported feeling distant and "super alert", and said he does not do well in large groups of people. (Tr. 468–469). Plaintiff expressed a desire to see a psychiatrist, and complained of not sleeping well and being depressed about his life situation. (Tr. 470). Physically, Plaintiff complained of constant, aching pain that radiates between his back and lower extremities. (Tr. 470). On examination, VA internist William Benish, M.D. noted a negative straight leg raise test, and that Plaintiff's back was non-tender. (Tr. 470).

Plaintiff's back pain began after falling from a scaffold in 1978. (Tr. 328, 367). By the late 1990's, Plaintiff was regularly complaining of chronic back pain to his doctors. (Tr. 796). In September 2004, Dr. Benish noted Plaintiff worked as a cook but reportedly could "not stand long enough to cook". (Tr. 464). In his assessment, Dr. Benish reported marital problems, hypertension, substance abuse, flat feet, musculoskeletal pain in "much of [Plaintiff's] body", and depression. (Tr. 464). He suggested physical therapy for Plaintiff's pain. (Tr. 464).

In October 2004, Plaintiff was evaluated by psychiatrist Laura Steinberg, M.D. (Tr. 370–373). Dr. Steinberg reported complaints of anxious and depressed thoughts, but found his thought process to be logical, coherent, and goal-directed. (Tr. 371–372). Plaintiff maintained concentration and attention, had intact judgment and insight, and had no current hallucinations. (Tr. 372). Dr. Steinberg concluded Plaintiff "does not meet [the] criteria for Major Depressive Disorder" or panic disorder. (Tr. 372). Instead, she diagnosed him with adjustment disorder. (Tr. 372).

In November 2004, Plaintiff began attending physical therapy to decrease his pain, increase his strength, and return his range of motion to within normal limits. (Tr. 367–368). This continued

well into 2005, with Plaintiff missing more than a month of physical therapy due to "personal problems". (Tr. 439). During his therapy, he was given a lumbar support brace based on his needed range of motion while at work, and was evaluated for custom orthotics. (Tr. 439, 441–443, 446). Plaintiff reported some improvement from the physical therapy, noticing an increase in flexibility, a decrease in pain, and a decrease in soft tissue tightness. (Tr. 443, 446).

Plaintiff's chronic pain reportedly worsened following a car accident in 2005. In November of that year, Plaintiff was driving a vehicle that rolled over and struck a tree. (Tr. 294). Plaintiff told hospital personnel he had been "cutoff by some kid". (Tr. 294). Upon arrive at the hospital via ambulance, ER physicians noted all four extremities had good strength, but Plaintiff "had some mid low thoracic spine tenderness" as well as upper cervical spine tenderness. (Tr. 294, 299). Plaintiff also suffered a closed head injury. (Tr. 295). He denied alcohol had been involved, but a toxicology screen conducted at the hospital was positive for alcohol. (Tr. 294, 298).

The day after the accident, Plaintiff was still in the hospital and continued to have numbness in his upper extremities. (Tr. 302). He was then evaluated by orthopedic surgeon Gregory Vrabec, M.D. (Tr. 302–303). Dr. Vrabec noted normal upper extremity strength, hand grip, wrist flexion, arm extension, and arm flexion. (Tr. 302). Despite Plaintiff's complaints of a "pins and needles" sensation, Dr. Vrabec found normal "strength plus sensation in all nerve distributions". (Tr. 302). But Dr. Vrabec noted tenderness to palpation over the spinous process at C3-C4. (Tr. 302). A CT scan of the spine revealed no fracture, dislocation, or subluxation. (Tr. 302). Additionally, the odontoid was "well located within C1." (Tr. 302).

Plaintiff was discharged from the hospital after CT scans of his head, neck, abdomen, and pelvis were all negative. (Tr. 304, 318–324). The scans did, however, show degenerative changes

with no "convincing acute abnormality" at the L5-S1 level. (Tr. 304, 316). The trauma team who

first attended to Plaintiff after his accident had ordered an MRI of his cervical spine. (Tr. 303). This

MRI revealed no evidence of a cervical fracture, epidural hematoma, or paraspinal mass, but did

show a central subligamentous disc protrusion at C6-C7 that was causing "slight mild central canal

narrowing", as well as minimal disc bulging at C4-C5 and C5-C6 that was causing "slight central

canal narrowing". (Tr. 304). Despite these findings, there was "no evidence of cord or nerve root

impingement." (Tr. 304). The final diagnosis from this hospitalization was "[n]on cord compressive

disc bulging in the cervical spine". (Tr. 305).

Following the accident, Plaintiff saw his primary care physician, Kyle Wear, M.D., to

manage his neck pain and other minor injuries. (Tr. 430, 433, 435). Specifically, Dr. Wear treated

him for a cervical strain, a right direct inguinal hernia, and multiple carbuncles. (Tr. 434). Plaintiff

told Dr. Wear he began binge drinking again after his accident. (Tr. 540). Over the summer of 2006,

Dr. Wear noted Plaintiff continued to have depression, and wanted to speak with a psychiatrist to

consider medical therapy for it. (Tr. 424). Plaintiff also complained of constant pain radiating from

his neck to his back and upper thighs. (Tr. 543).

On the recommendation of Dr. Wear, Plaintiff attended physical therapy again beginning in

September 2006. (Tr. 358–359). At his physical therapy evaluation, therapist Christopher Wood

reported Plaintiff showed "signs and symptoms of a possible L3-4 nerve root impingement".

(Tr. 358). He noted a decreased range of motion and tenderness to palpation, but also a negative

straight leg raise test. (Tr. 358). Eventually, Wood reported a "marked reduction" in Plaintiff's pain

after usage of a TENS unit and performance of lumbar traction. (Tr. 399, 407, 524). At that point,

Wood released Plaintiff from physical therapy with a TENS unit. (Tr. 400). Plaintiff nevertheless

4

asked for a referral to a pain management specialist. (Tr. 409).

In November 2006, Plaintiff presented to the emergency room at St. Thomas Hospital with complaints of back pain radiating into his right leg and numbness in his right toes. (Tr. 328). On examination, Plaintiff had back pain with flexion and decreased pain with extension. (Tr. 328). His extremities were non-tender, there was no edema, and his pulses were strong bilaterally. (Tr. 328). He had "only slight weakness" on the right side. (Tr. 328). A lumbosacral spine CT showed degenerative disc disease and hypertrophic changes at L3 and L4, but was otherwise normal. (Tr. 335). Plaintiff was given intravenous morphine then discharged with decreased pain. (Tr. 329).

In October 2007, Plaintiff was seen by psychiatrist Daniel Hatchett, M.D. (Tr. 287). Dr. Hatchett noted Plaintiff had recently been terminated from his job "after they completed his background check" and discovered approximately five felonies. (Tr. 287). He reported poor memory and concentration, and indicated these got worse after Plaintiff's 2005 car accident. (Tr. 287). Dr. Hatchett observed a logical and sequential thought process with fair insight, poor judgment, and intact memory, and he reported no hallucinations. (Tr. 288). At the time, Plaintiff was still using cocaine, alcohol, and marijuana. (Tr. 287). Dr. Hatchett's diagnosis was substance induced mood disorder. (Tr. 289).

Plaintiff was admitted to the hospital again in August 2008 with complaints of chest pain. (Tr. 235). After a cardiac catheterization revealed no blockages, doctors determined GI symptoms were causing Plaintiff's chest pain. (Tr. 235, 237). Plaintiff then underwent an upper endoscopy performed by gastroenterologist Costas Kefalas, M.D. (Tr. 234). This procedure revealed a large ulcer in the gastric fundus, as well as gastritis that was positive for Helicobacter pylori. (Tr. 234, 246, 248). Plaintiff was given various medications, observed overnight, and then discharged.

5

(Tr. 235). The final diagnoses noted were peptic ulcer and gastric erosions. (Tr. 235). Treatment notes reflected Plaintiff had a normal mood and affect during his hospitalization. (Tr. 238).

When Plaintiff followed-up with Dr. Kefalas a few weeks after his endoscopy, Dr. Kefalas reported he had "been doing well". (Tr. 239). In his review of symptoms, Dr. Kefalas wrote, with respect to Plaintiff's psychiatric symptoms, that Plaintiff "[d]enies anxiety, depression, difficulty sleeping, hallucinations/paranoia, panic attacks[,] or suicidal thoughts." (Tr. 240). Similarly, with respect to his musculoskeletal symptoms, Dr. Kefelas reported Plaintiff "[d]enies back pain, joint deformity, joint pain, joint swelling/redness, muscle weakness[,] or stiffness." (Tr. 240). Upon examination, Dr. Kefalas noted Plaintiff's judgment, insight, and memory were all within normal limits, and he was oriented to time, space, and person. (Tr. 240).

Plaintiff had an MRI in September 2008 that showed moderate to severe bilateral neural foraminal stenoses at L5–S1 due to a disc bulge "which may be impinging on both traversing S1 nerve roots". (Tr. 226). The same MRI revealed moderate to severe spinal canal and left neural foraminal stenoses at L4-L5 with a disc bulge, thickened ligamentum flavum, and mild disc degeneration. (Tr. 226). At L3-L4, the MRI showed moderate spinal canal and left neural foraminal narrowing with disc degeneration, disc bulge, and thickened ligamentum flavum. (Tr. 227).

Three days after his MRI, Plaintiff saw internist Daniel Wolpaw, M.D. (Tr. 264–268). On examination, Dr. Wolpaw reported slight sensory loss in the right lateral mid-leg, reflexes of "1+ and =" and "motor with +/- slight weakness R extensor 1st toe". (Tr. 267). He assessed "[s]ignificant lumbar disc disease with impingement and canal narrowing consistent with current s[ymptoms]. . . . No indication currently of significant neuro compromise." (Tr. 267). Dr. Wolpaw noted a positive straight leg raise test on the right side. (Tr. 267).

6

In October 2008, Plaintiff saw Donald M. Woods, M.D., for his back pain. (Tr. 255–257). Dr. Woods reported complaints of pain, numbness, and tingling, and noted Plaintiff's recent MRI that showed "severe lumbar canal and severe neuroforaminal stenosis". (Tr. 255). On examination, Dr. Woods reported "significantly diminished" forward flexion and somewhat diminished extension; normal extremity sensation except for the right lateral calf and into the toes; normal motor strength in all groups except the right tibialis anterior and right extensor hallucis longus; and right-sided lumbar paravertebral and sacroiliac joint tenderness. (Tr. 256). Dr. Woods was unable to determine Plaintiff's reflexes bilaterally. (Tr. 256). In light of the MRI showing severe stenosis with possible impingement of a nerve, though, Dr. Woods suggested Plaintiff receive a steroid injection as part of his "conservative treatment" for Plaintiff's pain. (Tr. 257).  He also suggested Plaintiff try physical therapy again. (Tr. 257). However, Dr. Woods noted that if his conservative treatments failed, he "may send [Plaintiff] to see a spine surgeon." (Tr. 257).

Plaintiff transferred his care from the Akron VA to the Cleveland VA Medical Center in November 2008. (Tr. 228). There, Plaintiff began seeing psychiatrist Nabila Rizk, M.D., who noted he walked with a cane and had a depressed mood and sad affect, but was coherent with no delusions or evidence of a psychotic process and denied suicidal or homicidal ideation. (Tr. 228–229). A nurse at the VA later counseled Plaintiff about the health risks of obesity, but Plaintiff refused a referral to a weight loss program. (Tr. 221). At that time, he complained of numbness under his knee and in two of his toes, and pain in his right buttocks that shoots down his right leg. (Tr. 225). The nurse's notes indicate Plaintiff was then smoking four cigarettes a day. (Tr. 226).

The following month, Plaintiff received a lumbar epidural steroid injection at L5-S1. (Tr. 215). The procedure was done under fluoroscopy with right bias because of Plaintiff's

complaints of right L5 and S1 radiculopathy. (Tr. 215). Treatment notes indicate the purpose of this injection was to decrease swelling and discomfort near the spine. (Tr. 219).

Plaintiff returned to the VA in February 2009 as a walk-in, after not showing up for two scheduled appointments with Dr. Rizk. (Tr. 214). He complained of being frustrated and said he was about to "clock out". (Tr. 214). A few days later, VA social worker Susan Lipkin saw Plaintiff and reported Plaintiff had a flat, sad affect and complained of depression symptoms, including suicidal ideation, fatigue, and feelings of hopelessness. (Tr. 208, 209). Plaintiff reportedly had been depressed for two years without a break. (Tr. 209). However, his thoughts were coherent, goal-directed, and logical. (Tr. 209). Lipkin also noted Plaintiff's history of substance abuse, reporting he last used crack cocaine in June 2008. (Tr. 209).

Since applying for benefits, Plaintiff has had numerous consultative examinations and residual functional capacity (RFC) assessments. This began in February 2005, when consultant psychologist Donald Leventhal, Ph.D., evaluated Plaintiff. (Tr. 707–713). He found no abnormality of mental content but impaired self-esteem. (Tr. 710). Dr. Leventhal also found impairments in Plaintiff's short-term memory, concentration, abstraction, and mental computation. (Tr. 711). Dr. Leventhal determined Plaintiff has marked impairments in his ability to maintain attention, concentration, persistence, and pace, and his ability to withstand the stress and pressures associated with day-to-day work activity. (Tr. 713). He diagnosed a mild case of major depressive disorder and assigned a GAF score of 50. (Tr. 712).

In March 2005, Plaintiff was seen by consultant internist Eulogio Sioson, M.D., for a disability evaluation. (Tr. 701–706). On examination, Dr. Sioson noted a negative straight leg raise test sitting, but "lying elicited pain in the hips at 40 degrees." (Tr. 702). He also observed no

8

abnormal behavior and found no sensory deficits, muscle atrophy, tremors, or rigidity. (Tr. 702). In his impression, Dr. Sioson wrote Plaintiff's neuromusculoskeletal data showed no objective findings, other than some pain, "that would affect work-related activities such as walking, climbing, standing, carrying, lifting, handling, sitting[,] and traveling." (Tr. 702).

Plaintiff's physical RFC was assessed in May 2005 by Cindi Hill, M.D. (Tr. 674–681). Dr. Hill determined Plaintiff could lift 50 pounds occasionally, 25 pounds frequently; could stand, sit, or walk about six hours in an eight-hour workday; and could push or pull without limitation. (Tr. 675). A review of Plaintiff's medical records convinced Dr. Hill that the "[l]evels of pain alleged far exceed objective findings and" management by Plaintiff's treating sources. (Tr. 681). Dr. Hill determined there was "clear evidence of sx exaggeration", though Plaintiff is "partially credible" about "some back pain" since 2004. (Tr. 681). Dr. Hill suggested a medium RFC with only occasional use of ladders, due to Plaintiff's flat feet and back pain. (Tr. 681).

Also in May 2005, Plaintiff's mental RFC was assessed by consultant psychologist Joan Williams, Ph.D. (Tr. 682–698). Dr. Williams noted Plaintiff has the medically determinable impairment of mild depression. (Tr. 685). She determined Plaintiff has moderate difficulties in maintaining social functioning, but no limitation in his activities of daily living or in maintaining concentration, persistence, or pace. (Tr. 692). Dr. Williams also determined Plaintiff is moderately limited in his ability to interact appropriately with the general public and his ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 697). But she concluded he has no other significant limitations. (Tr. 696–697). Overall, Dr. Williams said the evidence suggests an intact capacity to comprehend and implement simple to moderately complex instructions and tasks. (Tr. 638). She concluded Plaintiff retains the "capacity to maintain normative work pace"

and a full-time schedule of competitive-level activities. (Tr. 698). He could not, however, do "work requiring social finesse" or involving vulnerable populations. (Tr. 698).

In July 2006, consultant physician Joseph Leith, M.D., examined Plaintiff to evaluate his alleged impairments. (Tr. 588–594). Dr. Leith found Plaintiff's range of motion in his spine limited by pain, but noted a negative straight leg raise test both seated and supine. (Tr. 590). He reported Plaintiff's grasp, manipulation, pinch, and fine coordination to be within normal limits. (Tr. 589). He also reported being concerned about a possible closed head injury from Plaintiff's car accident, and recommended imaging of Plaintiff's L5 region because of a possible burst fracture there. (Tr. 590). Dr. Leith concluded Plaintiff would be limited in his ability to walk long distances, and lift or carry objects, but should be able to handle, hear, speak, and travel. (Tr. 590).

In September 2006, consultant psychologist Gary Sipps, Ph.D., conducted a mental status examination of Plaintiff. (Tr. 580–587). Among other things Plaintiff reportedly said at the evaluation, Dr. Sipps indicated Plaintiff's car accident may have been an inadvertent suicide attempt. (Tr. 583). Dr. Sipps noted the possibility of psychotic features in Plaintiff's thought content, but remarked that Plaintiff's alcohol and drug history complicate that possibility. (Tr. 583). Though Plaintiff "does participate in routine household responsibilities", Dr. Sipps determined his "overall functioning is at a moderately reduced level of efficiency", and assigned a GAF score of 44. (Tr. 584–585). His diagnoses were polysubstance dependence, cognitive disorder, and mood disorder. (Tr. 584).

Consultant psychologist Aracelis Rivera, Psy.D., conducted a mental RFC assessment in November 2006. (Tr. 554–570). Dr. Rivera noted Plaintiff is not completely credible "due to his history of substance abuse" – in fact, Plaintiff was still using at the time of this assessment.

10

(Tr. 556). He found Plaintiff undertakes many household tasks, such as vacuuming and taking out the trash, but noted that he "does have some difficulty focusing and problems concentrating for extended periods." (Tr. 556). Dr. Rivera found no marked limitations, but found moderate limitations in a handful of areas, such as Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 555). Dr. Rivera classified Plaintiff's depression symptoms as mood disorder not otherwise specified. (Tr. 561).

Dr. Rivera determined Plaintiff has moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and only a mild restriction of activities of daily living. (Tr. 568). Ultimately, he concluded Plaintiff "could perform in a work environment that does not involve strict production demands." (Tr. 556). The following April, this assessment by Dr. Rivera was "affirmed as written" by both Dr. Hill and psychologist Karren Terry, Ph.D. (Tr. 493, 556).

Medical consultant Maria Congbalay, M.D., conducted a physical RFC assessment in November 2006. (Tr. 573–579). She concluded Plaintiff's "reported limitations are more severe than the medical evidence indicates." (Tr. 577). In terms of his exertional limitations, Dr. Congbalay determined Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk for a total of about six hours in an eight-hour workday; and could push or pull without limitation. (Tr. 573). Dr. Congbalay further said Plaintiff could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, and could never climb ropes or scaffolds. (Tr. 574). She found no manipulative, visual, communicative, or environmental limitations. (Tr. 575–576).

VA social worker Susan Lipkin assessed Plaintiff's mental RFC in February 2009. (Tr. 203–205). She reported Plaintiff's abilities as "poor or none" in almost every category of

11

residual functioning, noting Plaintiff has difficulty concentrating, and is unable to focus, easily distracted, hyper vigilant, and paranoid. (Tr. 203–204).

<u>Administrative Hearing</u>

Plaintiff appeared with counsel at a hearing before the ALJ on May 26, 2009. (Tr. 801). Also appearing was Evelyn Sindelar, a vocational expert (VE). (Tr. 801).

Upon questioning, Plaintiff summarized his medical impairments: "I have back problems that bother me and hinder my walking, and my sitting and sometimes even my laying for periods of time. Very painful, very uncomfortable. As a result . . . sometimes[] my attitude is kind of not good and I find myself kind of being snappy." (Tr. 803). Plaintiff testified this attitude once caused him to get into a physical confrontation, resulting in criminal charges. (Tr. 804).

Plaintiff testified his pain is mainly in his lower back and hips. (Tr. 805). He said his pain shoots down his legs all the way to his calf, and is worse on the right side. (Tr. 805). This pain worsened, Plaintiff said, after his automobile accident during which he was reportedly ejected 25 feet from the windshield of the van he was driving. (Tr. 810–811, 816). Aside from the pain, Plaintiff also testified he gets spasms in his lower back. (Tr. 818).

Plaintiff testified he uses a TENS unit about three times a week, and it helps his pain some days. (Tr. 819). Plaintiff said he has needed to use a cane prescribed by his physical therapist ever since he fell a couple times. (Tr. 806, 813). But during the average day, he still takes care of his mother, drives her to appointments, helps her around the house, and cooks simple meals. (Tr. 807, 820). He spends "maybe four" hours a day doing such activities. (Tr. 821). Plaintiff testified he could sit for "maybe" 20 minutes, and could stand for "a little less" time than he could sit. (Tr. 809). He said he has trouble sleeping because of his pain, usually waking up "at least three times" in the

middle of the night. (Tr. 817).

Plaintiff testified about his vocational history. He said the last job he worked was as a cook at a country club, which ended in 2006. (Tr. 812). Before that, he did various temporary jobs including one as a telemarketer. (Tr. 812).

Plaintiff testified about his drug and alcohol use. He said he became sober around his birthday in July 2008, and attends AA meetings regularly. (Tr. 804, 808–810). Before that, he would use alcohol and cocaine as "a weekend thing" after getting paid, spending "maybe $500" a month on cocaine and alcohol. (Tr. 814–815). Plaintiff acknowledged being embarrassed by this aspect of his past. (Tr. 815). Despite his sobriety, Plaintiff testified he is still depressed, loses his temper, is not comfortable around unfamiliar people, and cannot handle stressful situations well. (Tr. 823–824). He testified he could not keep a job because there would be some days his depression and pain would prevent him from being on time and effective at work. (Tr. 824).

The VE testified and categorized Plaintiff's prior work as a cook as light, and his prior telemarketing work as sedentary, with neither job having transferrable skills. (Tr. 828). The ALJ then posed a hypothetical question for the VE, asking her to assume an individual who can lift and carry only 20 pounds occasionally, ten pounds frequently; can sit or stand at will; can use a foot-pedal; can only occasionally climb a ramp or stairs, but never a ladder, rope or a scaffold; can frequently balance, but only occasionally stoop, kneel, crouch, or crawl; has no manipulative limits, communications deficits, or eyesight problems; can do complex tasks; can handle stress; and must avoid heights and hazards. (Tr. 828–829). In response to this, the VE testified such an individual could perform Plaintiff's prior work as a telemarketer. (Tr. 829, 830).

The ALJ then altered his hypothetical to include the following restrictions: the individual can

13

only do simple, routine tasks; can only do low stress work; cannot have high production quotas or piece rate work; should have only superficial interpersonal interactions with the public and co-workers; and cannot push or pull. (Tr. 829). Assuming this hypothetical individual, the VE said such a person could still do Plaintiff's prior work as a telemarketer. (Tr. 830).

In the ALJ's third hypothetical, the individual was further limited by the restriction of not being able to do any arbitration, negotiation, or confrontation. (Tr. 830). In response to this, the VE said such a person could not perform telemarketing jobs. (Tr. 830). However, the VE testified such an individual could perform the jobs of gasket inspector, lightbulb assembler, or library clerk, each of which accounts for thousands of positions in the regional economy. (Tr. 831).

Plaintiff's attorney then asked the VE a series of questions. Among them, he asked whether an individual who is off task fifteen percent of the time per day due to psychological difficulties would be able to work a regular eight hour job, to which the VE responded he could not. (Tr. 834). Altering this slightly, the VE also testified that a person having to be absent for three entire days every month would be precluded from employment. (Tr. 834–835).

The Commissioner's Decision

The ALJ issued an unfavorable decision on June 12, 2009. (Doc. 9–24). Finding that Plaintiff met the insured status for DIB until March 31, 2007, the ALJ determined Plaintiff has the severe impairments of depression and degenerative disc disease of the lumbar spine. (Tr. 14). However, the ALJ said none of these impairments meets or equals one of the listings. (Tr. 15). He concluded Plaintiff could still perform a range of light work with various restrictions, and found ample jobs in the economy he would still be able to perform. (Tr. 16–24). Therefore, the ALJ made a finding of not disabled.

14

Plaintiff requested review of the ALJ's decision. (Doc. 13-1, at 2–4). On March 2, 2011, the Appeals Council denied review (Tr. 2), making the ALJ's denial the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 1382(a)(1), 423(a)(1)(E). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff now challenges the ALJ's decision on four grounds:

The ALJ erred by finding that the Plaintiff did not meet a "listing".

Defendant erred by failing to incorporate necessary limitations into the residual functional capacity finding.

The ALJ erred by not giving good reasons for finding Plaintiff not fully credible.

16

Defendant erred by adopting VE testimony in response to a hypothetical that is not supported by the evidence.

(Doc. 14, at 11–21). These arguments are addressed in turn.

Listing 1.04

Plaintiff argues the ALJ's determination that his impairment does not meet or equal Listing 1.04 is unsupported by substantial evidence. After reviewing the entire transcript, the Court disagrees. For a claimant to show his impairment matches a listing, he must prove his impairment satisfies all of the listing's specified medical criteria. 20 C.F.R. § 404.1525(d); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). This is not the case here.

Listing 1.04 specifies spinal impairments:

Disorders of the spine (e.g., herniated nucleas pulosus, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. 404 Subpt. P, App'x 1, § 1.04.

The medical evidence in this case shows, and the parties do not dispute, Plaintiff has degenerative disc disease of the lumbar spine (Tr. 304, 335) and spinal stenosis at C4-C5, C5-C6,

17

and C6-C7 (Tr. 255, 304). Though the parties dispute whether the record shows nerve root compromise, there is some evidence in the transcript indicating as much. In October 2008, Dr. Woods noted Plaintiff's September 2008 lumbar MRI shows "a disk bulge which appears to be impinging the bilateral S1 nerve roots." (Tr. 255). This impingement presumably developed sometime after Plaintiff's car accident, given Plaintiff's cervical spine MRI taken right after the accident showed "no evidence of nerve root sleeve impingement or foraminal stenosis". (Tr. 315). In fact, other than slight bulging at C6-C7 and minimal bulging at C5-C6 and C4-C5, Plaintiff's 2005 MRI revealed the rest of his spinal cord to be normal in size, shape, position, and signal intensity. (Tr. 315). The Court will assume for the sake of Plaintiff's argument that based on the 2008 MRI, the evidence establishes a disorder of the spine resulting in compromise of a nerve root. But Plaintiff still must show his impairment meets the criteria in paragraphs A, B, or C, and this he cannot do.

To show nerve root compression, paragraph A requires neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory loss or reflex loss, *and* positive straight-leg raising tests if there is involvement of the lower back. Here, there is involvement of Plaintiff's lower back. (Tr. 274, 470). Thus, for Plaintiff to meet this listing through the paragraph A criteria, there must be positive straight leg raising tests, both sitting and supine, in the record. Ultimately, Plaintiff cannot show he meets the paragraph A criteria because of this requirement. The record does show limitation of motion of the spine (Tr. 358, 433, 590, 705) and motor loss accompanied by both sensory loss and reflex loss, albeit minor (Tr. 256, 267). However, the record is insufficient to establish positive straight leg raising tests both sitting and supine. Plaintiff had a negative straight leg raise test in May 2004. (Tr. 470). In March 2005, Dr. Sioson noted a negative

18

straight leg raise test sitting, but reported "lying elicited pain in the hips at 40 degrees." (Tr. 702). When evaluated by Dr. Leith in July 2006, Plaintiff had a negative straight leg raise test "both seated and supine". (Tr. 590). Plaintiff had yet another negative straight leg raise test reported in September 2006. (Tr. 358, 413). The positive straight leg raise test in the transcript that Plaintiff relies on is from September 2008, when Dr. Wolpaw noted "SLR + on R" on examination. (Tr. 267).

The problem with Dr. Wolpaw's notes, as Plaintiff concedes in his Reply (Doc. 17, at 3), is that they do not specify whether the straight leg raise test was performed in the sitting or supine position. Moreover, the notes do not specify the test was positive in *both* sitting and supine positions. As such, this abbreviated report from Dr. Wolpaw cannot meet Plaintiff's burden of showing positive straight leg raise tests in both sitting and supine positions, especially in the face of so many negative straight leg tests unambiguously reported by at least three other doctors. Substantial evidence supports the conclusion Plaintiff does not have positive straight leg raise tests both sitting and supine. Accordingly, Plaintiff cannot show his impairment meets the paragraph A criteria.

Paragraph B requires an operative note, pathology report of a biopsy, or medically appropriate imaging to confirm spinal arachnoiditis. Plaintiff has not argued meeting this paragraph's criteria, and no evidence in the record suggests Plaintiff has spinal arachnoiditis. Similarly, no record evidence reports Plaintiff ever having a severe burning or painful dysesthesia. With no such medical evidence, the paragraph B criteria need not be considered. *See* 42 U.S.C. § 423(d)(5)(A).

As for paragraph C – requiring lumbar spinal stenosis that results in pseudoclaudication and is "established by findings on appropriate medically acceptable imaging" – Plaintiff's 2008 MRI

reportedly shows lumbar spinal stenosis (Tr. 226–227), but critically, paragraph C still requires an inability to ambulate effectively, among other things. The regulations define this concept:

> Inability to ambulate effectively means an extreme limitation of the ability to walk, i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. 404, Subpt. P, App. 1, § 1.00B2b(1).

Here, substantial evidence in the record shows Plaintiff's ability to walk, though somewhat restricted, is not *extremely* limited. Though before the alleged onset date, Dr. Benish once noted Plaintiff "moves without apparent difficulty". (Tr. 470). Importantly, the four consultant physicians who assessed Plaintiff's physical RFC after the alleged onset date – two of whom actually examined Plaintiff – each indicated his ability to ambulate effectively is less than extremely limited. Dr. Hill determined Plaintiff could sit, stand, or walk for about six hours in an eight-hour workday. (Tr. 675). Dr. Congbalay agreed with this, going so far as to suggest Plaintiff's "reported limitations are more severe than the medical evidence indicates." (Tr. 573, 577). Dr. Leith determined Plaintiff "would be limited physically with his ability to walk long distances" (Tr. 590), but this is a far cry from saying Plaintiff is extremely limited in his ability to ambulate effectively. Similarly, aside from some limitation because of pain, Dr. Sioson wrote Plaintiff's "neuromusculoskeletal data show[s] no other objective findings that would affect work-related activities such as walking". (Tr. 702). On examination, Dr. Sioson reported Plaintiff "walked with *slight* limp with no assistive device." (Tr. 701, emphasis added). This is not indicative of an extreme limitation.

None of Plaintiff's treating sources indicated he has such insufficient lower extremity functioning as to prevent him from ambulating without the use of a hand-held assistive device.

Despite Plaintiff's testimony that he started walking with a cane in 2005 (Tr. 818–819), no evidence indicates a physician ever prescribed him a cane. This was noted by a consultant physician in May 2005 (Tr. 681), but appears to remain true thereafter. To the contrary, Plaintiff's treating sources commonly reported good strength in Plaintiff's lower extremities. (Tr. 226, 302, 532, 537, 545). Most recently, in October 2008, Dr. Woods noted Plaintiff was "able to walk on his heels", even though he had a slow gait. (Tr. 256). Once again, though this evidence shows some limitation in Plaintiff's ability to ambulate, it does not show an extreme limitation.

Moreover, the pain and weakness in Plaintiff's legs were reported by Dr. Woods to be radicular, not nonradicular. (Tr. 256, 399). Furthermore, there is no mention of pseudoclaudication in Plaintiff's medical records. For all these reasons, he cannot show he meets the listing through the paragraph C criteria. Because substantial evidence shows Plaintiff cannot meet any of the paragraph A, B, or C criteria, the ALJ's determination that his impairments do not meet or equal Listing 1.04 must be affirmed.

RFC Finding

Plaintiff next argues the ALJ erred by not incorporating into his RFC finding all of Plaintiff's limitations. The ALJ found Plaintiff has the following RFC:

> [T]o perform light work . . . except he can lift and carry ten pounds frequently and 20 pounds occasionally; stand/walk and sit at will; no push or pull but can use a foot pedal; can occasionally climb a ramp or stairs but never a rope or scaffolds; can frequently balance, occasionally stoop, kneel, crouch and crawl; must avoid heights and hazards; simple routine tasks. No complex tasks, low stress work with no high production quotas or piece rate work; only superficial interaction with the public and co-workers, no arbitration, confrontation or negotiation[.]

(Tr. 16). Specifically, Plaintiff argues the ALJ should have included in his RFC finding Plaintiff's need for a cane, a restriction to sedentary work, and a limitation that Plaintiff would be off task

21

15–20% of the workday due to psychologically-based difficulties. A review of the record shows the omission of each of these limitations is supported by substantial evidence.

First, with respect to the need for a cane, substantial evidence supports the conclusion that Plaintiff's need for a cane is not established by his medical records. Plaintiff testified his physical therapist prescribed his cane, and that his physician at the VA "approved" it. (Tr. 806). He argues the record includes several instances with Plaintiff's treatment providers "noting his continued use of a cane". (Doc. 14, at 14). But noting the use of a cane is different from prescribing, or even advocating the use of, a cane. In fact, at least one of these instances refutes the notion that Plaintiff needs a cane.

Plaintiff cites four instances in the transcript where his cane is mentioned. The first is in an SSA form Plaintiff himself filled out, alleging a cane has been prescribed to him by a doctor. (Tr. 199). The second and third times are by treatment providers, Drs. Woods and Rizk, within a two-month span of each other. In October 2008, Dr. Woods reported Plaintiff "has a cane". (Tr. 256). In November 2008, psychiatrist Dr. Rizk noted Plaintiff "walks w[ith] a cane". (Tr. 229). Finally, the fourth instance is from consultant Dr. Hill. Dr. Hill's May 2009 evaluation listed "uses a brace and a cane" as part of Plaintiff's allegations. (Tr. 681). But none of these four records show the cane to have been prescribed by a doctor. In fact, the records as a whole tend to undermine Plaintiff's argument. The same day Dr. Woods mentioned Plaintiff has a cane, he reported Plaintiff was capable of walking on his heels. (Tr. 256). Moreover, Dr. Hill believed Plaintiff did not need a cane, writing "no use of or objectively supported cane/brace" under her review of the medical evidence. (Tr. 681). Furthermore, she remarked there was "clear evidence of sx exaggeration". (Tr. 681). And Dr. Rizk, a psychiatrist, noted Plaintiff's cane merely to assess his appearance as it

22

reflects on his psychological impairments[1], not as part of her suggested treatment. As a whole, the transcript does not suffice to show an objective medical basis for including a limitation accommodating Plaintiff's use of a cane in his RFC.

Contrary to Plaintiff's argument, substantial evidence in the record shows Plaintiff's RFC – which, by definition, is the *most* Plaintiff is still capable of doing, 20 C.F.R. § 404.1545(a)(1) – does not require accommodation for a cane. Though slightly before the alleged onset date, Dr. Benish once noted Plaintiff "moves without apparent difficulty". (Tr. 470). After reviewing Plaintiff's medical records, consultant Dr. Hill's comments indicated he did not think Plaintiff had been prescribed, or needed to be prescribed, a cane. (Tr. 681). As mentioned above in the context of Plaintiff's ambulation, Dr. Sioson found almost no objective findings that would affect work-related activities such as walking. (Tr. 702). On examination, Dr. Sioson reported Plaintiff "walked with slight limp with no assistive device." (Tr. 701). All of this amounts to substantial evidence supporting the omission of a cane restriction in Plaintiff's RFC, requiring the ALJ's omission of it be affirmed.

Plaintiff's second argument about the ALJ's RFC finding is that he can do no more than sedentary work, and the ALJ should have determined as much. In fact, Plaintiff argues the sit/stand option the ALJ concluded Plaintiff needs is inconsistent with light work, which the ALJ also concluded Plaintiff could do. (Tr. 16). To have a sit/stand option, Plaintiff argues, is inconsistent with doing any work at an exertional level higher than sedentary. The Court disagrees.

The regulations define these two exertional concepts, and distinguish them mainly by a

---

1. Dr. Rizk's "walks w[ith] a cane" note appears in the context of "he was a few min late for his appt, walks w a cane, neatly dressed & well groomed . . ." (Tr. 229). In other words, it was in no way a recommendation that he walk with a cane, or an indication that he needs to walk with a cane.

claimant's ability to lift varying weights:

>   (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a
>   time and occasionally lifting or carrying articles like docket files, ledgers, and small
>   tools. Although a sedentary job is defined as one which involves sitting, a certain
>   amount of walking and standing is often necessary in carrying out job duties. Jobs
>   are sedentary if walking and standing are required occasionally and other sedentary
>   criteria are met.
>
>   (b) Light work. Light work involves lifting no more than 20 pounds at a time with
>   frequent lifting or carrying of objects weighing up to 10 pounds. Even though the
>   weight lifted may be very little, a job is in this category when it requires a good deal
>   of walking or standing, or when it involves sitting most of the time with some
>   pushing and pulling of arm or leg controls. To be considered capable of performing
>   a full or wide range of light work, you must have the ability to do substantially all
>   of these activities. If someone can do light work, we determine that he or she can
>   also do sedentary work, unless there are additional limiting factors such as loss of
>   fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(a)–(b), 416.967(a)–(b).

Importantly, the ALJ did not find Plaintiff capable of performing the full range of light work. Rather, the ALJ said of the light work category, Plaintiff's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations." (Tr. 23). These additional limitations were incorporated into the ALJ's hypothetical to the VE. (Tr. 23).

There is substantial support in the record that Plaintiff is capable of performing light exertional work as defined above. Both consultant physicians who assessed Plaintiff's physical RFC concluded he could lift at least 20 pounds occasionally and ten pounds frequently. (Tr. 573, 675). Both also determined Plaintiff has no limitation in his ability to push or pull. (Tr. 573, 675). One of these physicians even thought Plaintiff could perform work at a medium exertional level. (Tr. 573). Similarly, Plaintiff's treatment providers routinely made findings consistent with an RFC allowing for light exertional work. For instance, immediately after Plaintiff's car accident, Dr. Vrabec noted

24

normal upper extremity strength, hand grip, wrist flexion, arm extension, and arm flexion. (Tr. 302). He found normal "strength plus sensation in all nerve distributions". (Tr. 302). At the VA, therapist Wood reported a "marked reduction" in Plaintiff's pain after usage of a TENS unit and performance of lumbar traction (Tr. 399, 407, 524), suggesting his physical symptoms are somewhat alleviated by treatment and exercise. There was even a time in September 2008 when Plaintiff denied having back pain, muscle weakness, or joint swelling. (Tr. 240). But most recently, in October 2008, Dr. Woods reported finding normal  normal motor strength in all groups except the right tibialis anterior and right extensor hallucis longus, despite Plaintiff's diminished forward flexion. (Tr. 256). All of this amounts to substantial evidence supporting the ALJ's conclusion Plaintiff is capable of performing a limited range of work at the light exertional level as defined by 20 C.F.R. §§ 404.1567(b), 416.967(b).

The Court believes the argument about a sit/stand option being inconsistent with light work is resolved by the language of SSR 83-12. That Ruling provides for situations where "the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing." SSR 83-12, 1983 WL 31253, at *4. "Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . or the prolonged standing or walking contemplated for most light work." *Id.* In such cases, the Ruling readily admits "[t]here are some jobs in the national economy . . . in which a person can sit or stand with a degree of choice." *Id.* The Ruling concludes a vocational expert "should be consulted" whenever there is an unusual limitation of a claimant's ability to sit or stand. *Id.*

It is not uncommon for claimants to have RFCs allowing for light work with a sit-stand

option, and the Sixth Circuit has not found the two to be incompatible. *See*, *e.g.*, *Lewis v. Sec'y of Health & Human Servs.*, 51 F.3d 272 (Table), at *1 (6th Cir. 1995) (affirming the Secretary's decision that included an RFC of "a limited range of light work with a sit/stand option"). In fact, courts outside the circuit have confronted the exact argument Plaintiff makes and have determined the ALJ is entitled to rely on VE testimony about light jobs capable of being performed with a sit/stand option – wholly consistent with SSR 83-12. *See Harris v. Astrue*, 2010 WL 1027822, at *11 (D.S.C. 2010) (citing *Walls v. Barnhart*, 296 F.3d 287, 290–292 (4th Cir. 2002)). The sit/stand option merely modifies the range of light exertional work the ALJ found Plaintiff capable of performing.

There is substantial record evidence supporting the ALJ's sit/stand option. For instance, in November 2004, Plaintiff's physical therapist wrote that prolonged standing "causes an elevation" of Plaintiff's symptomology. (Tr. 656). Plaintiff's VA records include similar observations. (Tr. 666). And the ALJ correctly included this limitation in the hypothetical questions he posed to the VE. (Tr. 828). In response, the VE provided three light exertional jobs the hypothetical person with a sit/stand option could still do. (Tr. 831). The ALJ was entitled to rely on this testimony and accept it as substantial evidence of jobs which accommodate the limitations included in his hypothetical. *See Foy v. Sec'y of Health & Human Servs.*, 951 F.2d 349 (Table), at *2 (6th Cir. 1991) ("A VE's response to a hypothetical that accurately portrays an individual's impairments constitutes substantial evidence for determining whether a disability exists."). Thus, the ALJ did not err by finding an RFC that allows for light work with a sit/stand option, and relying on VE testimony about jobs that accommodate that RFC.

Plaintiff's third RFC argument is that the ALJ erred by not finding him to be off task

26

15–20% of the time due to psychologically-based symptoms. The ALJ determined Plaintiff has mild difficulties with regard to concentration, persistence, and pace. (Tr. 15). Ultimately, even though there may be considerable evidence contrary to the ALJ's conclusion, there is still substantial evidence supporting the ALJ's conclusion, and that requires it be affirmed. *See Jones*, 336 F.3d at 477.

A review of the record shows divergent opinions on Plaintiff's ability to maintain concentration, persistence, and pace. Some mental health professionals have opined Plaintiff has no limitation at all in this ability (Tr. 692), some have said he has a marked limitation in it (Tr. 713), and others have given opinions in between (Tr. 568). The ALJ waded through these opinions and reached his determination by giving varying weights to them:

> I give limited weight to Dr. Leventhal's opinion that [Plaintiff] was markedly impaired in his ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks, as well as to withstand the stress and pressures associated with day-to-day work activity. The evidence shows [Plaintiff] was working and continued to work during this period.
>
> I give limited weight to Dr. Sipps' opinion on September 25, 2006, that [Plaintiff] was severely impaired in his ability to concentrate and attend to tasks, as well as to comprehend complex material. The evidence shows that [Plaintiff] was drinking and not maintaining sobriety in a report on September 5, 2006.
>
> I give medium weight to the assessment of the State agency psychological consultant on November 7, 2006 as her opinion is commensurate with the evidence.
>
> I give no weight to Ms. Lipkin's assessment on February 17, 2009. She based her assessment on limited interaction with [Plaintiff] and her assessment exceeds the evidence. [Plaintiff] was not suicidal or homicidal; he did not require crisis intervention, acute hospitalization or treatment consistent with the severity of impairment she indicated.

(Tr. 22).

Generally, an ALJ must consider a slew of factors – including the nature and extent of the

27

treatment relationship, the consistency of the opinion with the record as a whole, and the specialization of the opinion provider – in determining the weight given to each medical opinion. 20 C.F.R. § 416.927(c)(1)–(6). As the ALJ noted, consultant Dr. Leventhal evaluated Plaintiff in February 2005. (Tr. 707–713). He reported Plaintiff is markedly impaired in his ability to maintain attention, concentration, persistence, and pace. (Tr. 713). He also reported Plaintiff is markedly impaired in his ability to withstand the stress and pressures associated with day-to-day work activity. (Tr. 713). However, the ALJ rightly gave this opinion limited weight given that Plaintiff was, in fact, maintaining employment at the time. Plaintiff even testified he was working as a cook until 2006 when his back injury prevented him from continuing. (Tr. 812). In fact, the record shows Plaintiff continued to work various jobs for at least another two and a half years after Dr. Leventhal's assessment. Plaintiff told a nurse at the VA in September 2007 that he had recently been fired from his job as a telemarketer because he did not make his quota. (Tr. 290). This shows Plaintiff was capable of maintaining employment despite his psychological impairments at the time of, and well after, Dr. Leventhal's assessment. While Dr. Leventhal's findings are not completely unreliable, his stark assessment of Plaintiff's work-related mental abilities is somewhat undermined by these facts, and the ALJ was justified in discounting his opinion as a result.

Dr. Sipps opined that Plaintiff's ability to concentrate and attend to tasks is severely impaired, and his capacity for sustained concentration and persistence is moderately impaired. (Tr. 584–585). But the ALJ was indeed correct that the record indicates Plaintiff was not maintaining sobriety at the time. Plaintiff testified he was not sober until almost two years later. (Tr. 805). Dr. Sipps himself – who diagnosed polysubstance dependence and alcohol abuse (Tr. 585) – reported Plaintiff had consumed alcohol the week prior to his evaluation by him. (Tr. 581). Similarly, when

28

Dr. Rivera assessed Plaintiff just two months after Dr. Sipps, he noted a history of drug and alcohol abuse and reported Plaintiff was then "currently using". (Tr. 556). Because alcoholism and drug addiction as material factors contributing to disability prevent one from being found disabled for social security purposes, *see* 42 U.S.C. § 423(d)(2)(C), and because substantial evidence supports the ALJ's finding that Plaintiff was using alcohol at the time of Dr. Sipps' assessment, the ALJ rightly gave only limited weight to Dr. Sipps' opinion in an apparent attempt to weed out the severity caused by Plaintiff's lack of sobriety.

Plaintiff argues the ALJ erred by giving no weight to the opinion of social worker Susan Lipkin. Plaintiff cites *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011), for support of the proposition that social workers are considered treating sources under the regulations. However, Plaintiff misreads *Cole*. Contrary to Plaintiff's assertion, the Sixth Circuit did *not* hold "that a social worker is considered a treating source." (Doc. 14, at 18). Rather, the court said a social worker falls under the regulatory definition of an "other source" under 20 C.F.R. § 404.1513(d)(1), noting that treating sources are limited to "acceptable medical sources". *Cole*, 661 F.3d at 939. In fact, the Sixth Circuit had previously confronted the argument that a social worker should be considered an acceptable medical source, and the court said such argument "is without foundation." *Coil v. Charter*, 132 F.3d 32 (Table), at *4 (6th Cir. 1997); *see also Eldridge v. Apfel*, 173 F.3d 854 (Table), at *2 (6th Cir. 1999) ("The district court [noted] that although the administrative law judge is required to consider evidence provided by certain 'acceptable medical sources' including psychiatrists and psychologists, a social worker is simply considered an 'other source' whose opinion the administrative law judge *may* consider. . . We agree with the analysis . . . of the district court.").

Thus, as an "other source" under 20 C.F.R. §§ 404.1513(d), 416.913(d), the ALJ was not

required to give any weight to Lipkin's mental RFC assessment. But even if he had been, there is substantial evidence supporting the ALJ's stated reasons for giving no weight to Lipkin's assessment. The record shows Lipkin completed the mental RFC form (Tr. 203–205) after seeing Plaintiff just twice, both times in February 2009. (Tr. 208–213). At the first appointment, Lipkin found "no evidence of thought disorder", noting Plaintiff had logical, coherent, and goal-directed thoughts. (Tr. 209). She determined Plaintiff was "experiencing severe psychosocial stressors" related to his finances and medical problems, but did not "present a risk to himself or others". (Tr. 213). The following week, Lipkin repeated her conclusion that Plaintiff did not present a risk to himself or others despite his financial and marital problems. (Tr. 208). Nonetheless, Lipkin indicated Plaintiff has poor or no ability in almost every mental ability needed to do unskilled work. (Tr. 203). This is simply inconsistent with the severity level of her reported findings, and the ALJ would have been justified in discounting her opinion even if he had been required to give weight to it absent good reasons.

The ALJ's omission of an off-task restriction is consistent with the November 2006 RFC determination by Dr. Rivera (Tr. 554–555), to whose opinion the ALJ gave medium weight because it was consistent with the record as a whole. Dr. Rivera concluded Plaintiff would have "some difficulty" focusing and maintaining concentration for extended periods of time (Tr. 556), supporting the ALJ's conclusion of a mild limitation in sustaining concentration, persistence, and pace (Tr. 15) and thus no need for an off-task accommodation in Plaintiff's RFC. And the ALJ is correct; other medical records in the transcript further support the ALJ's omission of an RFC limitation for being off-task 15–20% of the time due to psychologically-based symptoms. Dr. Steinberg, the VA psychiatrist who evaluated Plaintiff in October 2004, reported he does not meet

the criteria for a formal diagnosis of major depressive disorder or panic disorder. (Tr. 372). She found his thought process to be logical, coherent, and goal-directed, and reported he maintained concentration and attention. (Tr. 371–372). Plaintiff's subsequent VA psychiatrist, Dr. Rizk, found Plaintiff to be coherent in November 2008 with no delusions or evidence of psychotic processes, and noted only "some" memory deficits. (Tr. 229). In addition, consultant psychologist Dr. Williams, whose opinion the ALJ did not explicitly mention in this context, determined in May 2005 that Plaintiff has "mild" depression. (Tr. 685). She concluded Plaintiff has no difficulty in maintaining concentration, persistence, and pace. (Tr. 692). Furthermore, she found no evidence of limitation in almost every category of sustained concentration and persistence. (Tr. 696–697).

In sum, though there is some evidence in the record suggesting Plaintiff has more than a mild limitation in his ability to maintain concentration, persistence, and pace, there is still substantial record evidence supporting the ALJ's omission of an off-task limitation. Accordingly, it must be affirmed.

Credibility Determination

Plaintiff argues the ALJ erred by not giving good reasons for finding Plaintiff less than fully credible. An "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th

31

Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination."). And if the

"ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so."

*Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

Here, the ALJ found Plaintiff's testimony not credible to the extent it was inconsistent with

his RFC finding. (Tr. 17). His reasons for this credibility determination were plenty:

> A consultative psychiatric evaluation on October 21, 2004, evidences [Plaintiff's] longitudinal history of back pain as well as a significant substance abuse. Laura Steinberg, M.D., noted an extensive use of various substances including alcohol, cocaine, crack, marijuana, angel dust, valium, opium, and a hallucinogen. At the time of the interview [Plaintiff] was involved with AA and reported sobriety since July 2002. Despite complaints of chronic back pain and a "pinched nerve" he related that he worked as a chef from 2–10 p.m. and enjoyed his job which he found physically demanding. Dr. Steinberg indicated that [Plaintiff] did not meet criteria for major depressive disorder, and assigned a GAF of 65.

> In regards to [Plaintiff's] back pain, the evidence shows that he received physical therapy beginning November 22, 2004. His activity level increased while working as a chef due to catering during the holidays. On December 21, 2004, he called the office complaining of a lot of back and leg pain from being on his feet all day. However, given the opportunity to see his physician, [Plaintiff] indicated that he could not pass up overtime and wanted an appointment after the holidays.

> As testified to by [Plaintiff], the evidence shows that he was involved in a motor vehicle accident on November 27, 2005, and was admitted to Akron General Hospital. . . . [H]is toxicology was positive for alcohol although he denied drugs and alcohol in the emergency room. . . .

> During a visit with Dr. Ware on September 19, 2006, [Plaintiff] complained of persistent back pain but was noted to be noncompliant with medication and he did not start physical therapy or pick up his TENS unit. There was no numbness, tingling[,] or leg weakness on examination and he was restarted on his medication. . . . Despite his complaints of pain, [Plaintiff] did not keep scheduled appointments with physical therapy as well. . . .

> Although [Plaintiff] continued to voice complaints of pain, he failed to show for appointments with pain management. . . .

> As indicated initially, [Plaintiff] was seen by Dr. Steinberg in 2004 for assessment of depression. A consultative psychological evaluation was performed on February

32

26, 2005, in which Donald Leventhal, Ph.D., opined that [Plaintiff] was markedly impaired in his ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks, as well as to withstand the stress and pressures associated with day-to-day work activity. However, [Plaintiff] reported he used alcohol on occasion but did not drink a lot and he denied the use of illicit mood-altering substance[s] despite his history of treatment in AA and the extensive use of multiple illegal substance[s] reported in the evaluation with Dr. Steinberg. . . .

Despite testimony that July 7, 2008, was [Plaintiff's] sobriety date at the hearing on December 8, 2008, [Plaintiff] testified that his sobriety date was July 11, 2008 at the hearing on May 26, 2009.[2] Moreover, [Plaintiff] related to Dr. Woods on October 28, 2008, that he rarely consumed a few glasses of alcohol and had not abused either alcohol or cocaine for two years. I further note, despite claims of sobriety, [Plaintiff] was still drinking "a beer during the week" when seen by Ms. Lipkin on February 10, 2009.

At the hearing on December 8, 2008, [Plaintiff] testified that he smoked a pack of cigarettes every three days; however, on May 26, 2009, he denied smoking cigarettes and stated that he occasionally smoked a cigar. In addition, despite [Plaintiff's] alleged disabling pain, he failed to show for appointments on numerous occasions; thus, the degree of pain he alleges is not consistent with missing appointments that may be beneficial in treating his pain.

(Tr. 17–21) (citations omitted). In particular, Plaintiff argues the ALJ should not be allowed to cite his past use of drugs and alcohol as a reason for his credibility determination when Plaintiff "did not hesitate to admit that he had a problem in the past, even admitting that he was 'really ashamed of [his] past.'" (Doc. 14, at 20).

The main problem with Plaintiff's argument is that the ALJ did not rely solely on Plaintiff's drug and alcohol use to find him less than fully credible. To the contrary, the ALJ listed numerous other reasons – not the least of which is the fact that multiple physicians who examined Plaintiff reported his allegations to be exaggerated or more severe than the objective medical evidence reveals. (Tr. 577, 681). Just as the ALJ noted, despite Plaintiff's persistent complaints of pain, he

2. This first hearing, which was reportedly continued on motion of Plaintiff's attorney, is not included in the transcript before the Court.

has a long history of frequently failing to show up for scheduled appointments at the VA. (Tr. 284–285, 291, 355–356, 383, 387, 390–391, 398–399, 402–403, 412, 422, 425, 438–440, 447, 465, 471, 515, 522, 797). He has also been reported as non-compliant with various treatments, instructions, and physical therapy. (Tr. 216, 383, 385, 411, 531, 537). This is more than enough to serve as substantial evidence supporting the ALJ's determination that Plaintiff's subjective complaints are not fully credible – let alone the inconsistent statements Plaintiff has made about his sobriety and smoking (Tr. 209, 226, 701, 708, 810), as the ALJ pointed out, and the fact Plaintiff testified he last worked in 2006 (Tr. 812) despite telling multiple providers he was working in the fall of 2007 (Tr. 287, 290). The ALJ's credibility determination must stand.

VE Testimony

Plaintiff's final argument is that the ALJ erred by asking the VE a hypothetical that did not include all of Plaintiff's established limitations, to wit: Plaintiff's ability to do only sedentary work, Plaintiff's ability to stay on task, and Plaintiff's need for a cane. The Court has already addressed these limitations and concluded the ALJ's omission of them is supported by substantial evidence. This argument therefore fails for the same reasons as described above.

CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Commissioner's decision denying benefits is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

        s/James R. Knepp, II        
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of

Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).